# Illinois Official Reports

## Appellate Court

---

### *People v. Abrams*, 2015 IL App (1st) 133746

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY ABRAMS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-3746 |
| Filed | December 22, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-19963; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Matthew R. Bolon and Laurence J. Bolon, both of Bolon Law Offices, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Mary A. Laird, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Neville and Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1     A friendship since childhood turned into a business relationship and then enmity. Defendant Jerry Abrams was convicted of theft of over $1.8 million from the complaining witness, Fred Lev, and sentenced to 12 years in the Illinois Department of Corrections, and ordered to pay $1.8 million in restitution.

¶ 2     Abrams argues that: (1) his sentence of 12-years' imprisonment is excessive and disproportionate; (2) the trial court should not have quashed his subpoena of bank records he would have introduced as substantive evidence contradicting the State's case and for impeachment of the complaining witness; (3) the trial court made improper comments before the jury that were a material factor in his conviction; and (4) the State failed to prove the charge of theft of over $500,000 beyond a reasonable doubt.

¶ 3     We affirm: (1) the trial court properly considered factors in aggravation and mitigation when it imposed a 12-year sentence of incarceration which was well within the range for a Class 1 felony; (2) the bank records were both irrelevant and cumulative evidence; (3) the trial court's conduct was a proper exercise of discretion; and (4) the State proved beyond a reasonable doubt that Abrams stole over $500,000 from Lev.

¶ 4                                   BACKGROUND

¶ 5     Before trial, Abrams subpoenaed his former business partner Lev's financial records from two banks, Bank Financial FSB and Hyde Park Bank. The trial court quashed all records except for 16 pages of loan application documents from the Hyde Park Bank dated June 28, 2013. The parties stipulated to bank records consisting of bank statements and copies of checks from LaSalle Bank/Bank of America (January 2004-June 2010); Hyde Park Bank (March 2009-May 2010); First DuPage Bank/First Midwest Bank (February 2004-February 2009); and Bridgeview Bank (January 2004-March 2010).

¶ 6                               Prosecution Witnesses

¶ 7     After years in the real estate business, in 1997 Lev founded, and was the sole shareholder of, "The Fred Lev Company." Abrams was his sole employee. At that time the only business assets were leases that Lev managed on behalf of clients. Lev also held a master lease for a building at 64 E. Walton, where he lived. Abrams worked part time for Lev handling the bookkeeping tasks, including depositing rents and security deposits for the leases into Lev's bank account.

¶ 8     Over the next few years, Lev personally bought several commercial buildings in Chicago's Streeterville neighborhood. The Fred Lev Company did not own any real estate property. Lev also received commissions for transactions he negotiated for clients. Lev estimated that the rent and commission income was $54,000 per month. Each property generated rental income that Abrams deposited in various bank accounts in three different banks. The rent checks were not designated to one particular bank; the accounts were commingled.

¶ 9     In 2001 or 2002, Lev noticed that the cash flow into his bank accounts was low, so he asked Abrams how the incoming money was being spent. Abrams told Lev there was "an abundance of insurance and utility bills and real estate taxes, etc." Lev trusted Abrams and believed him.

¶ 10    In 2003, Abrams told Lev he obtained his real estate broker's license. Abrams became the managing broker for the company. His new duties included renewing the corporate documents with the Illinois Secretary of State. Abrams gave himself the title of president, or sometimes vice president, and Lev was a "principle." Lev did not care what titles they each had.

¶ 11    Abrams' salary was $2,000 per month plus discretionary commissions as determined by Lev. Abrams took an expensive vacation yearly and had three lavish weddings for his daughters during this time. When Lev asked Abrams how he could afford his lifestyle, Abrams replied that he had income from his wife's pension, commission from referrals to a businessperson in Texas, and dividends from stock investments.

¶ 12    In May 2010, while Abrams was out of town, Lev opened a bank statement that had arrived in the office mail. He noticed an unusual check that was recorded in the check register as $2,000 but had been cashed for $2,999.99. Lev discovered other checks that were recorded inaccurately, all written by Abrams. Lev called Abrams and asked for an explanation; Abrams said that he was behind in his mortgage and that he would pay Lev back. Lev then left Abrams a voicemail saying that Lev would be working independently and Abrams should clean out his office. When Lev returned to the office after the weekend, he discovered Abrams had taken a credenza and most of the financial records.

¶ 13    Cathy Zack, a close friend, helped Lev search the empty office in an effort to find any records. The only remaining documents were some bank stubs and one original bank statement. Abrams wrote on the top of the bank statement: "two thousand dollars didn't cut it, no commissions in 22 months." On the bottom he wrote, "I'm not taking from you," "I've worked for 13 1/2 or 14 years." On the side it said "two thousand dollars, add nine ninety-nine and ninety-nine cents to catch up with mortgage interest. I was past due."

¶ 14    Lev then called his attorney who advised him to call the police.

¶ 15    Lev obtained copies of bank statements and the checks that had been written during the previous six or seven years. Lev hired Karen McAdam, a forensic tax accountant, to organize, analyze, and summarize the statements and cancelled checks from four accounts in three different banks. McAdam relied on bank statements and cancelled checks from the banks. Lev labeled all checks he did not authorize and indicated checks on which his signature was forged. McAdam created a spreadsheet for each bank account with improper checks highlighted in yellow. The summary identified checks in the amount of $850,642.01 from Bridgeview Bank between January 2004 and March 2010; $657,953.40 from an account at First DuPage Bank between March 2005 and February 2009; and $412,360 from a second account at First DuPage Bank from August 2005 through February 2009. The total amount of $1,878,817 was deposited in Abrams' LaSalle Bank account, his UBS investment account, or checks were made out to pay his personal expenses.

¶ 16    The parties stipulated that the self-authenticating documents from the Illinois Department of Financial and Professional Regulations indicated that Abrams had no professional licenses in the State of Illinois.

¶ 17                    Relevant Defense Testimony

¶ 18    Ronald Abrams, Abrams' nephew and a lawyer with other real estate companies and holdings, rented the entire second floor of a building owned by Lev and in which Lev and Abrams occupied space from 2002 to 2007. Ronald occasionally heard arguments between

Lev and Abrams. Lev had a violent temper while Abrams did not. Ronald usually saw his uncle at the office from 9 a.m. to 5 p.m. or thereabouts.

¶ 19    Defendant testified. He was named president of The Fred Lev Company from 2001 to 2009, and Lev "didn't want the responsibility." Abrams had no ownership interest in The Fred Lev Company. Abrams handled the administrative duties–collecting rents, paying bills and expenses, keeping the checkbook and ledgers–Lev used the checkbook for personal expenses "as if it was [his] own." Lev would often ask Abrams to withdraw cash for him from the account.

¶ 20    Abrams had the majority of the contacts for the business. His base salary was $2,000 per month but he and Lev had an agreement by which Abrams was entitled to commissions. Abrams never had a broker's license nor did he hold himself out to be a broker. From 2004 through 2008, however, Abrams listed his occupation as "real estate broker" on his federal income tax returns. He also deducted expenses for continuing education in real estate.

¶ 21    Around 2008, the real estate market declined and Abrams was unable to generate any business from his contacts. Abrams stated Lev was "very volatile" and blamed him. In 2008 and 2009, Abrams wrote checks from The Fred Lev Company to two contractors for remodeling at his home. Abrams endorsed a check made out to himself for $8,900 that was recorded in the check register as payable to Com Ed in the amount of $890.

¶ 22    Around 2010, Lev told Abrams that he was taking too much money so he "stopped." The total amount of the checks written over the years totaled over $2 million. After subtracting Abrams' salary of $2,000 per month, the amount in question was $1.8 million. Abrams felt he earned the $1.8 million.

¶ 23    The jury found Abrams guilty of theft of property exceeding $500,000. 720 ILCS 5/16-1(a)(2) (West 2012).

¶ 24                                    Sentencing

¶ 25    At sentencing, the trial court found in mitigation that Abrams was a "contributing member of society," a "good provider" for his family, had no prior record, was employed his whole life, had no drugs or gangs in his background, and was 68 years old.

¶ 26    The trial court listed aggravating factors as the "planned" and "extensive" nature of the crime as premeditated and spanning a number of years; Abrams' lack of contrition; the amount of the theft ("almost four times the minimum" amount); the fact that victim was over 60 years old; and the victim impact statement. The trial court went on to characterize Abrams' testimony as "absolutely preposterous," and then stated "I think perjurious would be an appropriate name for it also."

¶ 27    The trial court then imposed a sentence of 12 years' imprisonment and restitution of $1.87 million.

¶ 28                                    ANALYSIS
¶ 29                                    Sentencing
¶ 30    Abrams argues that the 12-year term of incarceration imposed by the trial court was excessive and violated his constitutional right under the eighth amendment to the United States Constitution (U.S. Const., amend. VIII). Abrams also raises a related issue, asserting that his imprisonment term violated the proportionate penalties clause because it was not imposed

according to the seriousness of the offense and was determined without the objective of "restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Abrams characterizes the resulting sentence as "cruel, degrading, and so wholly disproportionate to the offense committed as to shock the moral sense of the community."

¶ 31    The sentencing range for a Class 1 felony is not less than 4 years' or more than 15 years' imprisonment. 730 ILCS 5/5-4.5-30 (West 2010). The trial court sentenced Abrams to a 12-year term. Illinois case law presumes a sentence within the statutory mandated guidelines is proper and will not be overturned or reduced unless it (1) affirmatively departs from the spirit and purpose of the law, or (2) is manifestly contrary to constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). A sentence promotes the spirit and purpose of the law when it reflects the seriousness of the offense and gives adequate consideration to defendant's rehabilitative potential. *Id.*

¶ 32    We review a sentence within statutory limits for an abuse of discretion. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 56. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no "reasonable person" would agree with it. *People v. Rivera*, 2013 IL 112467, ¶ 37. The sentencing court has the opportunity to weigh the mitigating and aggravating factors, including a defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). A trial court need not detail precisely for the record the exact thought process undertaken to arrive at the ultimate sentencing decision or articulate its consideration of mitigating factors. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 33    Abrams recites the aggravating and mitigating factors that he claims were present, and then concludes, based on a numerical tally, that factors in mitigation outweigh those in aggravation. We presume that a trial court has considered all mitigating evidence presented, absent evidence to the contrary other than the sentence itself. *People v. Hill*, 408 Ill. App. 3d 23, 30 (2011). As the State points out, the trial court directly referenced and explicitly stated every mitigating factor now argued. In aggravation, the trial court also remarked on how Abrams exhibited "treachery" to someone he considered a lifelong friend; the length of time the theft continued; and the premeditation involved. The trial court also mentioned the amount of money stolen, the age of the victim (on the day Abrams was arrested, Lev was 66 years old), and Abrams' lack of contrition. Further, the sentence falls within the limits prescribed by statute and fits the fundamental law and its spirit and purpose. "It is the trial court's duty–not ours–to balance the mitigating and aggravating factors and to make a reasoned decision as to the appropriate sentence." *People v. Shaw*, 351 Ill. App. 3d 1087, 1095 (2004). We find no abuse of discretion.

¶ 34    Abrams next argues his sentence violates the dictates of the Illinois Constitution which provides that "[a]ll penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The first factor we just addressed. In this section of his brief, Abrams argues only that the trial court made no mention of the goal or potential for rehabilitation at the sentencing hearing. Again, a trial court's sentencing decisions are entitled to great deference and will not be disturbed on appeal absent an abuse of discretion. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 88. Moreover, we take the record as a whole and do not focus on a " 'few words or statements made by the trial court.' " *Id.* ¶ 94 (quoting *People v. Sims*, 403 Ill. App. 3d 9, 24 (2010)). "The seriousness of the offense or the need to protect the public may outweigh

mitigating factors and the goal of rehabilitation. [Citation.] Even where there is evidence in mitigation, the court is not obligated to impose the minimum sentence. [Citation.]" *Sims*, 403 Ill. App. 3d at 24.

¶ 35　　With these principles in mind, we affirm the sentence. Abrams cites no cases supporting his contention that a 12-year sentence of incarceration for a 68-year-old person "simply does not comport with the goal of rehabilitation." Despite this, we observe that in assessing a defendant's character and potential for rehabilitation, a trial court, in addition to the material contained in a presentencing report, may consider the defendant's character as demonstrated by his conduct during trial and up to the time the court imposes the sentence. *People v. Moody*, 66 Ill. App. 3d 929, 931 (1978).

¶ 36　　We cannot ignore Abrams' attitude as expressed in his testimony that he felt entitled to the $1.8 million. Abrams' insistence on his innocence and lack of remorse tellingly indicate his character and prospects for rehabilitation. See *People v. Ward*, 113 Ill. 2d 516, 528 (1986).

¶ 37　　　　　　　　　　　　　　Trial Court's Conduct

¶ 38　　Abrams subpoenaed loan applications and financial records from two banks: Bank Financial FSB and Hyde Park Bank. The trial court quashed the subpoenas with the exception of 16 pages from June 28, 2013, from Hyde Park Bank. Abrams argues the excluded records should have been allowed as substantive evidence rebutting the State's case-in-chief because they were relevant for a determination of whether Abrams engaged in theft, whether he was authorized to withdraw the funds, and whether Lev was aware of the withdrawals. Further, Abrams claims he should have been able to use the documents to impeach Lev.

¶ 39　　A subpoena, a judicial compulsory process guaranteed by the sixth amendment to the Constitution of the United States, is applicable in "all criminal prosecutions." U.S. Const., amend. VI; *People v. Shukovsky*, 128 Ill. 2d 210, 222 (1988). To warrant the use of a pretrial subpoena, a defendant must show: (1) the requested documents are (a) evidentiary and relevant; and (b) not otherwise procurable reasonably in advance of trial by exercise of due diligence; (2) he or she cannot properly prepare for trial without production and inspection of the documents in advance of trial and failure to obtain an inspection may tend to unreasonably delay trial; and (3) the application was made in good faith, and was not a general "fishing expedition." (Internal quotation marks omitted.) *Id*. at 225. The trial court's ruling on a motion to quash a subpoena will not be reversed unless the trial court's finding of fact was "manifestly erroneous." *People v. Daniels*, 346 Ill. App. 3d 350, 364 (2004). To be manifestly erroneous the ruling must contain clearly evident, plain, and indisputable error. *People ex rel. Madigan v. J.T. Einoder, Inc.*, 2015 IL 117193, ¶ 40. And because the trial court stands in the best position to weigh the evidence and determine witness credibility, we accord the trial court's ruling great deference. *Id.*

¶ 40　　In seeking to use the bank records as substantive evidence to rebut the State's case-in-chief and for impeachment of Lev, defense counsel argued to the trial court that the documents from Bank Financial FSB showing Lev's two mortgages on a residence on Chestnut Street indicates he was a "sophisticated purchaser of properties" who knew "where every dime [was] going." Abrams now claims he was unable to cross-examine Lev as to his "bias, interest, or motives to testify," thus violating the confrontation clause of the sixth amendment.

¶ 41　　The trial court concluded that the loan applications on Lev's residence were irrelevant to proving theft of business income. We agree. The charges facing Abrams were for theft of

income from the business properties and Lev's residence was neither part of the business nor did it generate income.

¶ 42 Regarding bias, interest, or motive to fabricate testimony, the jury heard testimony as to Lev's income and properties. Abrams did cross-examine Lev based on his income tax returns and business documents. We agree with the State that any additional documents, even if they were relevant, would have been cumulative.

¶ 43 Additionally, the mortgages from Bank Financial FSB were dated 2011 and 2012. The charges against Abrams arose out of events before May 2010 when Lev discovered evidence of theft, and therefore too remote in time, having occurred after the theft, and properly excluded for that reason alone.

¶ 44 Regarding the Hyde Park Bank documents, the trial court allowed a total of 16 pages of those records, and the trial court excluded the rest of the material as cumulative. (A discussion on the record about the motion to quash is unclear, with the defense attorney arguing relevance of a loan application from "that bank" without naming which bank he meant. Taken in context, we believe he was referring to Hyde Park Bank, not Bank Financial FSB.) After the court allowed nine pages of the Hyde Park Bank records, it reconsidered and allowed seven more pages of the loan documents. Although the record indicates the rest of the Hyde Park Bank records had been impounded with the Bank Financial FSB documents, they are not included in the common law record. When a record is insufficient to support an appellant's claim, we presume that the missing information would support the trial court's ruling. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). It is not the obligation of the appellate court to search the record for evidence supporting reversal of the trial court. *Coleman v. Windy City Balloon Port, Ltd.*, 160 Ill. App. 3d 408, 419 (1987).

¶ 45 Abrams also argues that the documents would have shown the impact of the theft on Lev's quality of life, a factor relied on by the trial court in his sentencing. Contrary to his assertion, the evidence presented included Lev's income tax returns, loan application documents, and ownership of several Gold Coast properties. The trial court was fully apprised of Lev's lifestyle and business dealings. The excluded documents were both irrelevant and cumulative.

¶ 46 Abrams also asserts that he was prejudiced by the trial court's comment "That's not impeaching" when ruling on the State's objection to defense counsel's cross-examination of Lev:

"[Defense Attorney]: So now we have two statements, under oath, one to the jury yesterday when you said you told him to come back, and now you have another statement, under oath, where you said he came back without my permission or approval."

The trial court then remarked, "Objection sustained. That's not what that said. That's not impeaching." The following exchange occurred in the presence of the jury:

"THE COURT: He testified–he testified that he didn't give him permission to remove all that stuff in the credenza, and that's what that says. That's–

THE WITNESS: That's exactly–

THE COURT: –that objection's sustained.

[Defense Attorney]: Your Honor I would argue different–

THE COURT: That's not impeaching. That is–

[Defense Attorney]: It's for the jury to determine.

THE COURT: That is not impeaching. Ask your next question."

¶ 47    Abrams' complaints about the trial court's comments hardly merit discussion. "A judge's comments constitute reversible error only if the remarks prejudice the defendant. [Citation.] It is the defendant's burden to show that he has been harmed by the trial court's remarks." *People v. English*, 287 Ill. App. 3d 1043, 1047 (1997). Defense counsel continued to argue after the trial court ruled on the objection. The trial court's remarks simply reiterated its ruling, and responded to defense counsel's insistence on the matter. The trial court may make comments which respond to defendant's arguments about impeachment in the presence of the jury. *People v. Batchelor*, 202 Ill. App. 3d 316, 328 (1990). We find no prejudice.

¶ 48    Abrams also challenges the propriety of the trial court's statement: "[a]sk your next question" and argues that references to forgery were prejudicial. Abrams claims the trial court's conduct of the trial revealed "overt hostility to and bias against the defense." The State responds that these points are forfeited on review.

¶ 49    The law in Illinois is well-established: absent plain error, both a trial objection and a written posttrial motion raising the issue are required to preserve an alleged error for review. *People v. Enoch*, 122 Ill. 2d 176, 190 (1988). The forfeiture rule, however, is less rigidly applied where the basis for the objection is the conduct of the trial judge. *People v. Nevitt*, 135 Ill. 2d 423, 455 (1990) (supreme court considered defendant's issues concerning the conduct of trial judge even though defendant had not raised any issues of judicial impropriety in his posttrial motion). Abrams neither objected at trial to the judicial remarks now challenged on appeal, nor did he raise these issues in his posttrial motion. Notwithstanding the procedural omissions, we find that the waiver rule is "flexible enough on the authority of *Nevitt* for us to consider the alleged judicial impropriety in this case." *People v. Young*, 248 Ill. App. 3d 491, 498 (1993). Thus, we address Abrams' points.

¶ 50    In *Young*, the defendant argued that the trial court abrogated its duty as impartial referee, became an advocate for the State, made erroneous rulings, communicated to the jury its impatience with defense counsel and belittled defense counsel. *Id.* at 499-501. This court found that "[a]lthough it would have been better if some of the comments had not been made," the trial court's comments in four rather lengthy colloquies were not a material factor in the defendant's conviction or so prejudicial as to constitute reversible error. *Id.* at 502-03. Certainly, the isolated remark in this case does not constitute a "material factor" as contemplated by *Young*.

¶ 51    We agree with the State's assessment that "[a]sk your next question" was a direction to defense counsel to proceed. As discussed, defense counsel continued to argue after the trial court sustained the State's objection, and the trial court made the remark only after again sustaining the objection. "A court's method of ruling upon an objection may indicate an opinion as to the validity of a party's position; however, the context of the judge's remark must be considered in determining whether any prejudice resulted." *Id.* at 502.

¶ 52    The other forfeited issue concerns the trial judge permitting "the state and state's witness to repeatedly accuse the defendant of the crime of forgery in the presence of the jury [*sic*]." Not only was this issue forfeited for lack of objection at trial or in the posttrial motion, Abrams' brief is devoid of record citations or case law as required by Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013). Accordingly, we will not consider it.

¶ 53    Abrams also complains that in sentencing the trial court "accused the defendant of perjury." First, this point is inappropriate in an argument that claims the jury was prejudiced.

Second, a trial court may properly use in aggravation its perception that the defendant committed perjury at trial, as this factor is relevant to the defendant's attitudes toward society and his or her prospects for rehabilitation. *United States v. Grayson*, 438 U.S. 41, 50 (1978); *Ward*, 113 Ill. 2d at 528. See *People v. Nelson*, 206 Ill. App. 3d 956, 967 (1991) (court's observation at sentencing hearing that defendant contradicted his earlier testimony and should be held in contempt does not demonstrate hostility; rather, court made correct assessment that defendant potentially perjured himself).

¶ 54 We observe that in making this argument, Abrams cites for support *People v. Zaccagnini*, 29 Ill. 2d 408 (1963), a completely inapposite case. There, after a witness failed to identify the defendant, the trial court pointed a finger at him and asked the witness if he was one of the perpetrators. The trial court also told a witness for the defense " 'don't lie' " and asked the witness "if he understood the sanctity of an oath and what perjury is." *Id*. at 409. Nothing of the kind happened here and Abrams' attempt to bolster his argument is without merit.

¶ 55                                  Reasonable Doubt

¶ 56 Finally, Abrams argues that the evidence adduced at trial did not support a guilty verdict. When considering a challenge to the sufficiency of the evidence in a criminal case, we decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Washington*, 2012 IL 107993, ¶ 33. In so doing, we allow all reasonable inferences from the record in favor of the prosecution. *Id*. We may not substitute our judgment for the judgment of the trier of fact regarding the weight of the evidence or the credibility of the witnesses. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt. *Washington*, 2012 IL 107993, ¶ 33 (citing *People v. Ross*, 229 Ill. 2d 255, 276 (2008)).

¶ 57 Abrams asserts that the State did not prove he obtained "unauthorized control" of more than $500,000 of Lev's property. Abrams recognizes the evidence presented at trial established that over $1.8 million was taken. Abrams contests the finding that the entire amount was taken from Lev and not The Fred Lev Company. This is a distinction without a difference. Two separate doctrines of law guide our decision.

¶ 58 First, the alter ego doctrine of corporate law was developed for and has been traditionally used by third persons injured due to their reliance on the existence of a distinct corporate entity. *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 173 (1994). "The doctrine fastens liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527 (2002). In the context of "piercing the corporate veil," an alter ego analysis starts with examining the factors which reveal how the corporation operates and the particular party's relationship to that operation. *A.G. Cullen Construction, Inc. v. Burnham Partners, LLC*, 2015 IL App (1st) 122538, ¶ 43. Generally, did the corporation function simply as a facade for the dominant shareholder? *Id*. Here, without question, the corporate entity, The Fred Lev Company, served as the alter ego or business conduit of Lev, and Abrams' own testimony confirmed it.

¶ 59 Second, the indictments sufficiently apprised Abrams of the charges against him. See *People v. Collins*, 214 Ill. 2d 206, 219-20 (2005) (any variance was neither material nor

prejudicial to defendant). We do not believe that the defendant was in any way prejudiced by the indictments at issue.

¶ 60 Even more convincing is that in opening statements to the jury, defense counsel told the jury that the checking accounts "were not used solely for [Lev's and Abrams'] corporate work. They didn't separate the corporation from their personal lives and personal expenses. *** They were using everything that went into that corporate account and writing checks on it for their own personal private, for their own person use. There was a commingling." Additionally, defense counsel referred to "Fred Lev and Company" as being both Abrams and Lev. In closing argument, defense counsel argued that the company was "a small-time operation" with "one corporate book" that both Lev and Abrams used as "their own personal piggybank."

¶ 61 Given Abrams' own theory of the case, we will not delve further into his repeated statement that the prosecution made "no effort" to prove the amount of income that was taken from Lev and the amount that was taken from The Fred Lev Company.

¶ 62                                    CONCLUSION
¶ 63 We affirm the conviction and sentence of 12 years' imprisonment and order of restitution.

¶ 64 Affirmed.