2020 IL App (1st) 182162-U

No. 1-18-2162

Order filed December 7, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 10165 |
| | ) | |
| EDWARD BELL, | ) | Honorable |
| | ) | William T. O'Brien, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence for being an armed habitual criminal over his contention his 15-year sentence was excessive.

¶ 2    Following a jury trial, defendant Edward Bell was found guilty of one count of being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2012)) and one count of unlawful use of weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2012)). The trial court merged the UUWF count into the AHC count and sentenced defendant to 15 years' imprisonment. On

appeal, defendant contends the trial court abused its discretion in imposing his sentence. We affirm.

¶ 3     The State charged defendant by information with, *inter alia*, one count of AHC and one count of UUWF, after a handgun was found under the driver's seat of a vehicle in which defendant was the driver and sole occupant. Prior to trial, after being admonished in accordance with *People v. Curry*, 178 Ill. 2d 509 (1997), defendant rejected a plea offer that would have resulted in him receiving an eight-year prison sentence to be served at 50% in exchange for his guilty plea on a reduced charge.

¶ 4     At trial, officer Jacquelin Kinsella testified that, around 11:20 a.m. on May 10, 2013, she was driving her unmarked police vehicle south on the 3900 block of North Central Avenue, with two other officers, Kevin Kilmer and Joseph Kessel. Kinsella observed defendant, who was driving a green Pontiac sedan, pass a vehicle on the right using a parking lane, and she initiated a traffic stop.

¶ 5     During the stop, she learned defendant's driver's license had been revoked. Kessel asked defendant to step out of the vehicle because "he could no longer be in possession of the vehicle" because his license had been revoked. The officers handcuffed defendant and Kinsella and Kilmer transported him to the station. Kessel drove defendant's vehicle to the impound at the station pursuant to the Municipal Code of Chicago and a special order of the Chicago police department. At the station, Kessel performed an inventory search of the vehicle and informed Kinsella he had found a small revolver loaded with one round wrapped in a blue towel under the driver's seat.

¶ 6     Kessel and Kilmer also testified and their accounts of the events were consistent with Kinsella's. Kilmer added that, after Kessel informed him a gun was found in defendant's vehicle,

he spoke with defendant and advised him of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant waived his rights and told Kilmer he brought the gun from home, placed it in a towel, and placed it under the seat.

¶ 7 Sergeant Eric Velez testified that, on July 14, 2014, he was an investigator for the Correctional Information and Investigations Division of the Cook County Sheriff's Office. He intercepted a letter written by defendant and intended for his son, Cherelle Bell. The letter was admitted into evidence and published to the jury in its entirety.[1] In the letter, defendant directed Cherelle to tell investigators that (1) he loaned defendant his car the night before defendant went to jail because defendant's work van had broken down; (2) he could not prove the car belonged to him because the title was in the glove compartment "when it was crushed by the auto pound"; and (3) he loaned his car to numerous other people. In addition, defendant told Cherelle not to worry about the gun because, "[a]s far as [Cherelle] knew, there wasn't no gun inside of [the] car and anyone could have put it there and forgotten about it," and this would prove to the court neither he nor defendant had knowledge of the gun. Defendant told Cherelle that he needed to see him before his next court date to ensure that Cherelle was "on point with what's in this letter."

¶ 8 The State presented several stipulations, including that (1) if called, a firearm examiner would testify that the gun was operable; and (2) defendant had been convicted of the qualifying offenses necessary to sustain both charges.

¶ 9 Defendant moved for a directed verdict, which the trial court denied.

¶ 10 Cherelle, who was a convicted felon and on parole at the time of trial, testified that, in 2013, he purchased an unloaded revolver from a drug addict who was walking through an alley

---

[1] We will refer to Cherelle Bell by his first name to avoid confusion with defendant.

while he was riding in someone else's car. He could not state when he purchased the gun, but estimated it was a "couple of" or "some" days before defendant's arrest. He wrapped the revolver in a towel, placed it under the seat of his car, and "forgot about it." On May 9, 2013, he loaned his car to defendant because defendant's work van was not working. At the time, he did not tell defendant he had placed the gun under the seat. In the five years following defendant's arrest, Cherelle never told anyone the gun belonged to him.

¶ 11    Defendant testified that, on May 9, 2013, he borrowed Cherelle's car because his work van had broken down and kept it until the next day, May 10, 2013, so he could go to work. Defendant never placed anything under the driver's seat and was not aware there was a gun under it.

¶ 12    Around 11:30 a.m., he was driving north on Central just south of Irving Park Road, when he saw an unmarked police vehicle, containing three officers, perform a U-turn and proceed north, about four or five vehicles behind him. The vehicle activated its emergency lights and, after "clear[ing] the length of the next block," defendant pulled his vehicle to the side of the road. The police vehicle pulled in behind him and all three officers exited their vehicles with "their guns slightly drawn from their holsters."

¶ 13    Defendant gave his state ID card and two tickets he had previously received to the police. Kessel told him to step out of the vehicle and, as he did so, Kessel "snatched [him] literally up out of the car" and arrested him for driving on a revoked license. The officers transported defendant to the station and handcuffed him to a ring in a holding cell, where he fell asleep. Kilmer later woke him up and took him to an interrogation room, handcuffed him to the wall, and exited the room, slamming the door behind him. Kilmer returned with a detective and told defendant they had found a gun wrapped in a towel under the driver's seat. Defendant denied knowledge of the

gun and told Kilmer he needed to call an attorney. Kilmer told defendant he did not need an attorney because the gun was inoperable, and he had nothing to worry about. Defendant was then booked into jail. According to defendant, Kilmer never read defendant his *Miranda* rights.

¶ 14    Defendant admitted he wrote the letter that was intended for Cherelle and explained that his intention for the letter was to "find out who could have possibly put [the gun] under [the seat]."

¶ 15    In rebuttal, Kilmer testified (1) he did not move defendant from a holding cell into an interrogation room; (2) he never had a detective with him when he spoke to defendant; (3) defendant never told him he wanted to call an attorney; and (4) he never told defendant he had nothing to worry about because the gun was inoperable.

¶ 16    The jury found defendant guilty of both AHC and UUWF. Defendant filed a posttrial motion, which the trial court denied.

¶ 17    Prior to sentencing, the trial court received a presentence investigation report (PSI). The PSI reflected that defendant was 47 years old at the time of the offense and had the following prior convictions: (1) possession of controlled substance in 1988, for which he was sentenced to 30 months of probation that was terminated unsatisfactorily; (2) armed robbery in 1991, for which he was sentenced to eight years in prison; (3) manufacture or delivery of between 15 and 100 grams of cocaine in 1998, for which he was sentenced to nine years in prison; (4) driving under the influence of alcohol in 2002, for which he was sentenced to one year of supervision; (5) "Other Amt Narc Sched I/II" in 2004, for which he was sentenced to eight years in prison; (6) possession of a controlled substance in 2004, for which he was sentenced to one year in prison; (7) driving under the influence of alcohol in 2008, for which he received a sentence of conditional discharge

that was terminated unsatisfactorily; and (8) driving on a suspended or revoked license in 2009, for which he was sentenced to two weeks in the county jail.

¶ 18    The PSI also reflected that defendant left high school during his sophomore year as a result of disinterest but earned his general equivalency diploma (GED) in 2000 while incarcerated and certifications in sanitation and communication in 2018 while incarcerated. The PSI also stated defendant was employed as a patient transporter from July 2012 through April 2013 for a patient transportation company and sporadically as a car mechanic from 2007 through early 2012. The PSI further stated that defendant had 8 children and 12 grandchildren and, in 2006, had successfully overcome habitual cocaine misuse.

¶ 19    At sentencing, the State argued in aggravation that defendant had an extensive criminal history, which showed "a complete and utter disregard for the law" and warranted a "substantial penitentiary sentence."[2] Defense counsel argued a "fair sentence" was warranted given that, although defendant had a substantial criminal history, he had not harmed anyone and had been working at the time of the offense.

¶ 20    In allocution, defendant apologized "for this case even being in front of [the court]," that he had changed his life since his most recent conviction, and maintained his innocence from the charges in this case. During his statement, the trial court and defendant discussed some of his prior convictions, and defendant downplayed his fault in them, stating he had made some poor choices, "had nothing to do with" his prior armed robbery conviction, and his prior possession of a

_____

[2] During the sentencing hearing, the State noted this was defendant's third Class X offense but, after some discussion between the parties and the court, the State indicated it was not seeking a term of natural life (see 730 ILCS 5/5-4.5-95 (West 2012)) because that would constitute a double enhancement, as his two prior Class X convictions were the predicate convictions for the armed habitual criminal conviction.

controlled substance conviction was "put on" him and his attorney in that case suffered a heart attack and died, which influenced him to plead guilty.

¶ 21    The court merged the UUWF count into the AHC count and sentenced him to 15 years' imprisonment. In doing so, the court noted it had listened to the parties' presentations in aggravation and mitigation, considered the exhibits which had been submitted in mitigation, and considered the statutory factors in mitigation and aggravation, including defendant's extensive criminal history. In addition, the court noted defendant had attempted to evade responsibility for his actions in this case and in those leading to his prior convictions.

¶ 22    Defendant filed a motion to reconsider sentence, which the trial court denied. In denying the motion, the court noted it had considered the factors in aggravation and mitigation, that defendant had a "substantial background," and nevertheless imposed a sentence "in the mid-range of the potential sentencing parameters." This appeal followed.

¶ 23    On appeal, defendant contends the trial court abused its discretion in sentencing him to 15 years' imprisonment. Specifically, defendant argues his sentence is disproportionate to the possessory nature of the offense, fails to reflect his rehabilitative potential, and does not serve "the public good."

¶ 24    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including: "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well

as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 25 The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, the trial court has broad discretionary powers in imposing a sentence, which are entitled to great deference. *Id.* at 212. We do not reweigh the evidence in aggravation and mitigation or substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Instead, we will overturn a sentence only where the trial court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 26 After reviewing the record, we conclude the trial court did not abuse its discretion when it sentenced defendant to 15 years' imprisonment. The offense of AHC is a Class X felony, which has a statutorily mandated sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/24-1.7(b) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). Because defendant's 15-year prison sentence fell within that range, we presume the sentence is proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if defendant makes an affirmative showing the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has failed to make such a showing.

¶ 27 Here, the record shows that in imposing sentence the trial court specifically noted it had considered the parties' arguments, the exhibits and other matters presented in aggravation and

mitigation, including the statutory factors in mitigation and aggravation, and defendant's extensive criminal history. Further, the court noted defendant had attempted to evade responsibility for his actions in this case even after making an admission the gun belonged to him by writing the letter to Cherelle. The court also noted that defendant minimized his responsibility for the actions leading to his prior convictions. Based on this record, especially in light of defendant's extensive criminal history, we cannot say the court abused its discretion in sentencing him to 15 years' imprisonment, a term on the lower end of the permissible sentencing range for a Class X offense.

¶ 28 Defendant nevertheless argues that his sentence was disproportionate to the nature of the offense. In doing so, he analogizes his case to *Stacey*, where the defendant was convicted of aggravated criminal sexual abuse and criminal sexual abuse based on his conduct of briefly grabbing the breasts of two teenage girls over their clothes, and he was sentenced to two consecutive 25-year prison terms. *Stacey*, 193 Ill. 2d at 206-08. The supreme court concluded the defendant's sentence was "manifestly disproportionate to the nature of the offenses," finding that while the defendant's behavior was "appalling and harmful, it [was] not severe enough to warrant a 25-year sentence." *Id.* at 210.

¶ 29 We decline defendant's invitation to engage in a comparative sentencing analysis. See *People v. Fern*, 189 Ill. 2d 48, 62 (1999) (holding a claim that a sentence is excessive must be based on the particular facts and circumstances of that case and rejecting a comparative-sentence approach). Moreover, defendant's argument denigrates the seriousness of the offense, which is the most important sentencing factor. *People v. Murray*, 2020 IL App (3d) 180759, ¶ 30. As this court has recognized, the AHC statute was enacted "to help protect the public from the threat of violence that arises when repeat offenders possess firearms." *People v. Johnson*, 2015 IL App (1st) 133663,

¶ 27. Thus, in classifying the offense as a Class X offense, our legislature recognized the seriousness of the mere possession of a firearm by a person twice convicted of a qualifying offense. Here, defendant, a felon twice convicted of serious offenses, including one violent felony, was found in possession of a loaded and operable firearm, which posed a serious threat of violence. See *id.*

¶ 30    Defendant also notes the State offered a plea agreement prior to trial under which he would have been sentenced to eight years' imprisonment and that his sentence is more than twice the minimum for this Class X offense. Defendant maintains that in light of these facts, his sentence was excessive. We are not persuaded.

¶ 31    First, we note the State's prior plea offer holds no relevance to the trial court's determination of an appropriate sentence. *People v. Schnoor*, 2019 IL App (4th) 170571, ¶¶ 93-94 ("[W]e emphatically reiterate that what the State may have offered defendant during plea negotiations *is irrelevant*." (Emphasis in original.)). Second, we note that while defendant's sentence is more than twice the 6-year minimum for a Class X felony, his 15-year sentence is in the lower half of the applicable sentencing range. See *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 19 (the midpoint of the Class X sentencing range is 18 years). Simply put, we are not persuaded that the length of defendant's sentence is itself indicative of an abuse of discretion. See *People v. Branch*, 2018 IL App (1st) 150026, ¶ 34.

¶ 32    We are likewise not persuaded by defendant's contention the trial court overlooked his rehabilitative potential in determining his sentence. According to defendant, his employment history, educational achievements, and the fact he overcame a cocaine misuse habit demonstrated he was capable of rehabilitation and, therefore, his lengthy sentence was unwarranted.

¶ 33    A defendant's rehabilitative potential is only one factor to be considered by the trial court, and it is not entitled to more weight than any other factor. *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). In any event, the evidence upon which defendant relies to support his argument—that he was employed at the time of the offense, had earned his GED while previously incarcerated, and had overcome a cocaine misuse habit—was before the trial court when it imposed defendant's sentence. We must presume, therefore, the court considered that evidence in determining his sentence. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 33.

¶ 34    Moreover, we note defendant had a proven track record of lawlessness, which continued even after earning his GED in 2000 and overcoming his habitual cocaine misuse in 2006. The record shows that defendant was convicted of "Other Amt Narc Sched I/II" and possession of a controlled substance in 2004 and was sentenced to eight- and one-year prison terms, respectively. Defendant continued his pattern of lawlessness after ceasing his cocaine misuse and was convicted of driving under the influence of alcohol in 2008 and driving on a suspended or revoked license in 2009. See *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009) (finding a defendant's criminal history "alone" would warrant a sentence "substantially above the minimum").

¶ 35    Finally, defendant argues his 15-year sentence is contrary to "the public good." In support of his argument, he cites studies relating to the ineffectiveness of long sentences for possessory gun offenses in curbing gun violence and the community harm caused by the mass incarceration of African-American men.

¶ 36    We decline to consider the studies cited for the first time on appeal, as to do so would interject expert-opinion evidence into the record that was not subject to cross-examination or considered by the trial court. See *People v. Mehlberg*, 249 Ill. App. 3d 499, 531-32 (1993).

Moreover, we note again the trial court expressly stated it had considered the matters presented to it in determining defendant's sentence, which included evidence about defendant's race and his family. While we are not unsympathetic to defendant's argument on this point, we are unable to conclude, in the absence of an affirmative showing otherwise, that the court failed to consider the effect of his incarceration upon the "public good." *Abrams*, 2015 IL App (1st) 133746, ¶ 33.

¶ 37    In sum, the trial court carefully considered the evidence before it at sentencing, weighed the factors in aggravation and mitigation, and fashioned an appropriate sentence in line with the seriousness of the offense and defendant's potential for rehabilitation. Defendant essentially asks this court to reweigh the evidence and usurp the trial court's discretion to fashion an appropriate sentence. We decline to do so. *Alexander*, 239 Ill. 2d at 213. Based on the record before us, we conclude defendant's 15-year sentence was not greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. See *Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 38    For the reasons stated, we affirm the trial court's judgment.

¶ 39    Affirmed.