NOTICE

Decision filed 08/30/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190249-U

NO. 5-19-0249

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-CF-1424 |
| | ) | |
| CAMERON MATLOCK, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's sentence is affirmed where the trial court did not abuse its discretion in determining the length of the sentence.

¶ 2    This is a direct appeal from the circuit court of Madison County. The defendant, Cameron Matlock, was convicted of first degree murder. On June 14, 2019, he was sentenced to an enhanced sentence of 80 years' imprisonment followed by 3 years of mandatory supervised release (MSR). The defendant contends that the court abused its discretion in sentencing him to imprisonment of 80 years. We affirm.

¶ 3    On June 22, 2017, the State charged the defendant by indictment with three alternative counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2016))

1

(counts I, II, and III) and one count of armed robbery (*id*. § 18-2(a)(4)) (count IV).[1] Count I alleged that the defendant, with the intent to kill or do great bodily harm, shot the victim, Derrance G. Taylor, resulting in the victim's death. Count II alleged that the defendant shot the victim, knowing such an act created a strong probability of death or great bodily harm to the victim, thereby causing the victim's death. Count III alleged that the defendant shot the victim and caused his death during the commission of an armed robbery. Count IV alleged that the defendant knowingly took property from the victim by the use of force. As to each count, it was alleged that the defendant personally discharged a firearm that proximately caused great bodily harm or death to the victim.

¶ 4      On April 8, 2019, the defendant's four-day jury trial commenced. The State presented the following evidence. On the evening of May 13 and into the morning of May 14, 2017, the defendant, Romell Hamilton, and Dejuan Bean drove to Midtown, a nightclub in Alton. Hamilton parked in a nearby parking lot; he and the defendant went inside while Bean got into another car to smoke and drink.

¶ 5      Cornelius Ross was standing outside of Midtown smoking a cigarette when he saw the victim arrive at the bar. The victim had a bottle of alcohol with him as he entered the bar and bought four more drinks at the bar. Ross said the victim had "like a thousand" dollars in cash. At some point, Hamilton and Ross had a conversation inside of Midtown. Hamilton testified that during the conversation, Ross told him that the victim had money

---

[1]The defendant was also charged with one count of unlawful possession of weapons by a felon, but this charge was severed from the others prior to trial and later dismissed after the defendant was convicted of first degree murder.

on him, and he suggested that Ross speak with the defendant, which he did. However, Ross testified that he never had a conversation with Hamilton about robbing someone and was not trying to set up a robbery. Instead, he claimed he told Hamilton that he and the victim wanted to purchase drugs, but Hamilton "blew it off because he didn't have it."

¶ 6    Eventually, Hamilton, Bean, and the defendant got back into Hamilton's car. As Hamilton was driving out of the parking lot, the defendant got out of the car, saying, "there they go" or "there she go." Hamilton heard the defendant say something like, "there are too many bitches out here." Hamilton thought the defendant was either going to find a woman or the guy with the money, so he drove around the area with his headlights off, thinking he would pick up the defendant after a little while. Hamilton knew the defendant had a gun on him that night. After driving around for a bit, Hamilton saw the defendant in the middle of Union Street and asked him "what you want, bro?" The defendant motioned with his hands indicating the direction of where he was going or what he was doing, and Hamilton drove off. Shortly thereafter, Hamilton heard one gunshot. He turned his car around and, as he was driving, saw the defendant and an unidentified individual running. The other individual then fell to the ground, and the defendant started knocking on Hamilton's car window to be let in. The defendant entered the car with $50 in his hand, and Hamilton drove off. Bean testified that the defendant appeared upset and stated, "f***, s***, somethin' was wrong." Hamilton and Bean did not see the defendant fire a gun at anyone, and they did not see him holding a gun when he got in the car.

¶ 7    Hamilton drove to his sister's house. The defendant got out of the car and attempted to cock an automatic handgun because it was jammed. Both Hamilton and Bean saw the

defendant holding the handgun at that time. Hamilton eventually took the defendant and Bean home.

¶ 8 Myron Mitchell, Travis Moore, and Andre Darden were in a truck at the intersection of Spring Street and Union Street when they saw two men wrestling in the street. Darden testified that one man had short twists and the other had long dreadlocks. Moore also recalled that one of the men had long dreadlocks or braids. They heard gunshots and saw the two men who had been fighting start running away. One of the men fell to the ground while the other got into a car. Moore remarked that the man who got into the car looked like the defendant. They did not see anyone holding or shooting a gun. Mitchell got out of the car to check on the person who had fallen and realized it was the victim. Darden had a loaded gun on him at the time, and he hid it under some rocks when the police arrived.

¶ 9 Officer Zachary Dellamano of the Alton Police Department responded to a disturbance at Midtown around 4 a.m. on May 14, 2017. He was standing outside of the bar when he heard two gunshots. He notified dispatch and drove to where he believed the gunshots came from. He discovered a body lying in the street at the intersection of Spring Street and Union Street, which was a couple of blocks from Midtown. Additional officers arrived at the scene shortly thereafter. The victim was pronounced dead at the scene. From the victim's pockets, officers recovered a pair of dice, about $11, one lottery ticket, a lighter, and a baggy containing a white powdery substance consistent with cocaine. No weapons were located near or by the victim, and no bullets were recovered from his body. In the larger crime scene area, the police photographed and collected a cellular phone, four lottery tickets, open bottles of Bud Light beer, a pair of sunglasses, and a Taurus Judge

4

pistol. The pistol was fully loaded. No gun or discharged cartridge casings connected to the victim's murder were found at the scene.

¶ 10    Dr. Gershom Norfleet, a forensic pathologist, performed the victim's autopsy. He observed a gunshot entrance wound to the back side of the shoulder and a coordinating gunshot exit wound on the side of the left chest. He determined that the victim suffered a contact wound, and that the gun was discharged from a close range of "centimeters or even closer." He also found abrasions on the victim's fingers and forehead. The victim had tetrahydrocannabinol in his system and a blood alcohol concentration of .120. Dr. Norfleet concluded that the cause of death was a gunshot wound to the chest and that the manner of death was a homicide.

¶ 11    Detective Sergeant Mike O'Neill of the Alton Police Department interviewed Bean as part of his investigation into this case. During the interview, Bean specifically stated that the defendant said, "there he go," as he exited Hamilton's vehicle in the Midtown parking lot. Bean said he heard two gunshots that evening, and as soon as the defendant reentered Hamilton's vehicle, he stated, "f***, s***, d***, I f*** up" and "I shot him." Bean also told officers that the defendant later said he tried to rob the victim at gunpoint, the victim gave him the money, but the victim then rushed the defendant, and the defendant shot the victim. Bean did not want to speak with the police or testify at trial, but he eventually spoke with the police because he was concerned that he would get charged for the offense. Sergeant O'Neill described surveillance footage that was recovered during the investigation and that corroborated statements made by the various witnesses.

5

¶ 12 The jury found the defendant guilty of first degree murder[2] and not guilty of armed robbery. The jury further found that when the defendant committed the offense of first degree murder, he personally discharged a firearm that proximately caused the death of another person. The defendant filed a motion for new trial, which was denied.

¶ 13 The trial court then held a sentencing hearing on June 14, 2019. At the hearing, the court indicated that it had received the presentence investigation report (PSI), which was filed on May 1, 2019, along with two addendums. According to the PSI, the defendant had a good relationship with both of his parents and had social support from his family, friends, and significant other. The defendant had completed his general education diploma (GED) while at the Forrest City Medium Security Federal Bureau of Prisons facility in 2016, desired to continue his education, and had maintained employment throughout his life when he was not incarcerated. The PSI noted that the defendant was on federal parole at the time he committed the present offense. The defendant had prior felony convictions for mob action and unlawful possession of a firearm by a convicted felon as well as prior misdemeanor and petty offenses.

¶ 14 In aggravation, the State presented the testimony of Sergeant O'Neill. He testified that, in December 2008, he investigated a report of mob action where the defendant was identified as one of four individuals involved in chasing a man and pushing him to the

_____

[2]The jury was instructed as to "first degree murder Type A," which was described as the defendant intended to kill or do great bodily harm or knew that his actions created a strong probability of death or great bodily harm (counts I and II), and "first degree murder Type B," which was felony murder predicated on the armed robbery charge (count III). The verdict forms indicated that the jury found the defendant guilty of "first degree murder Type A" and not guilty of "first degree murder Type B." Similarly, the judgment entered by the trial court indicated that the defendant was sentenced on "merged counts I and II," citing 720 ILCS 5/9-1(a)(1), (2).

ground. The defendant was accused of kicking and striking the man after he had been pushed to the ground. The man went to the hospital and received treatment for minor injuries. In August 2009, Sergeant O'Neill investigated another report of mob action where the defendant and other suspects were involved in a physical altercation against one individual. The defendant admitted that he was fighting rival gang members and punched at least one person.

¶ 15 In December 2013, the police responded to "a report of some loud noises" in Alton. The officers came across two individuals in a vehicle, one of which was the defendant, and found a loaded firearm on the floorboard in front of where the defendant was seated. The police eventually learned that the firearm was stolen. The defendant was convicted of federal charges related to this incident.

¶ 16 Sergeant O'Neill stated that there were significant efforts made to locate witnesses in the instant case. Many of the witnesses, including Hamilton and Bean, were reluctant to speak with police out of fear of retaliation from the defendant, his family, or his acquaintances. Approximately 10 days after the shooting, the police located and arrested the defendant in Missouri. At the time, he was staying with a woman who informed the police that she discovered they were looking for the defendant after reading a newspaper article. She confronted him about it, and he admitted that the police were looking for him but denied any responsibility in the shooting.

¶ 17 As additional evidence in aggravation, the State presented victim impact statements from the victim's family members. The State then recommended a 70-year prison sentence, arguing that the trial court should consider the defendant's history of prior

criminal activity, his character and attitude, the nature of the act constituting the offense, the fact that "he has known [*sic*] no remorse for taking Derrance Taylor's life," deterrence, and the fact that he committed the crime while he was serving a period of mandatory supervised release from federal prison for a firearm offense.

¶ 18   Defense counsel argued that the trial court should consider rehabilitation as a factor in rendering the defendant's sentence.  Counsel asserted that a 70-year sentence "gives absolutely no possibility for rehabilitation," and that "by all indications at 71, in his 70's, he will have matured.  He will be rehabilitated, and he will not be a danger to anyone."  Counsel also alleged that the 26-year-old defendant was still developing and that his repeated drug use impeded that development.  Counsel requested that the court impose the minimum sentence, asserting that it would protect the community, give the defendant a chance at rehabilitation, and ensure he would never hurt anyone ever again.

¶ 19   The defendant then gave the following statement in allocution:

> "I just want to address the family, his mother, this young lady right here, his father, and the other lady I'm looking at right now.  I know you ain't really want to hear from me or too much that I can really say to y'all.  But I do want to let y'all know that I am truly and deeply sorry about the situation at hand that happened, and I hope that y'all can, you know, heal.  And I hope God help y'all.  I wish y'all the best in the process of that.  And that's—I mean I don't know what else to say."

¶ 20   Thereafter, the trial court announced its sentencing decision.  The court found that the following statutory factors in aggravation applied: "number three, which is that he has a history of prior delinquency or criminal activity; number seven, which is the sentence is necessary to deter others from committing the same crime; and, number 12, which was that the defendant was on mandatory supervised release at the time that his offense occurred."

8

The court concluded that no statutory factors in mitigation applied, stating, "I went through [the mitigating factors] a couple different times trying to find one that applied, and I didn't find any that did." The court stated that it considered "the presentence investigation and the addendums"; the "history, character, and attitude of the defendant"; the "financial impact of incarceration"; the "factors in aggravation and mitigation"; counsels' arguments; and the defendant's statement. The court stated,

> "Mr. Matlock *** [is] a young man, but he made decisions throughout his life that led him to the exact place that he is right now. And he and he alone made those decisions. And the sentence that I am going to hand down today is a sentence to ensure that Mr. Matlock is never able to make another decision that hurts another human being again."

The court sentenced the defendant to 40 years' imprisonment as to first degree murder and 40 years' imprisonment as to the firearm enhancement with the sentences ordered to run consecutively, for a total of 80 years' imprisonment to be followed by 3 years of MSR. The court informed the defendant that he would have to serve 100% of his sentence. It announced, "That sentence is handed down, Mr. Matlock, to ensure that you never walk amongst us again and you're never able to hurt another individual. It does not give me any joy to issue that sentence, and I don't do it lightly."

¶ 21    On June 14, 2019, the defendant filed a motion to reconsider sentence asserting, *inter alia*, that his sentence was "excessive in view of the Defendant's background and the nature of his participation in the offense." The trial court denied the motion to reconsider sentence, finding that it had considered all the mandatory factors as well as the defendant's age and background.

¶ 22    The defendant filed his notice of appeal on June 14, 2019.

9

¶ 23                                 II. ANALYSIS

¶ 24    The defendant's sole contention on appeal is that the trial court abused its discretion in sentencing him to 80 years' imprisonment.  It is well settled that a court is given broad discretion in fashioning a sentence.  *People v. Patterson*, 217 Ill. 2d 407, 448 (2005).  When a sentence falls within the statutory sentencing range for an offense, it may not be disturbed absent an abuse of discretion.  *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995).  A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable to the extent that no reasonable person would agree with it.  *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32.  The court is given such deference because it is in a better position to consider, among other things, defendant's credibility, mentality, demeanor, general moral character, age, habits, and social environment.  *Id*.  A proper sentence balances the seriousness of the offense with the objective of restoring a defendant's rehabilitative potential.  Ill. Const. 1970, art. I, § 11.

¶ 25    The Unified Code of Corrections permits the trial court to consider certain statutory factors in aggravation and mitigation when imposing a sentence of imprisonment.  730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2018).  In fashioning the appropriate sentence, the court must carefully weigh all of the factors in mitigation and aggravation, which include defendant's age, demeanor, habits, credibility, criminal history, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime.  *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010).  When such factors have been presented for the court's consideration, it is presumed, absent some contrary indication, that the factors have been considered.  *People v. Flores*, 404 Ill.

App. 3d 155, 158 (2010). A court has considerable latitude in sentencing a defendant, as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *Id.* at 157. When reviewing a court's sentencing decision, the reviewing court should not focus on a few words or statements made by the trial court. *People v. Newlin*, 2014 IL App (5th) 120518, ¶ 23. Instead, the determination of whether the sentence was improper must be made by considering the record as a whole. *Id*.

¶ 26 The defendant was convicted of one count of first degree murder, with a sentencing range of 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2018). He was sentenced to imprisonment of 40 years, which was within the sentencing range. As to the firearm enhancement, he was sentenced to imprisonment of 40 years, which was also within the sentencing range. See *id.* § 5-8-1(a)(1)(d)(iii) (providing for a sentencing enhancement of 25 years or up to a term of natural life imprisonment where defendant personally discharged a firearm proximately causing death to another person). Nevertheless, the defendant argues his sentence should be reduced because "factors in mitigation support a lesser sentence, including his largely nonviolent criminal history, rehabilitative potential, and remorse." We disagree.

¶ 27 We find that the defendant's sentence was appropriate given the particular facts and circumstances of this case. The record reveals that the trial court considered the defendant's criminal history when determining his sentence. The PSI detailed the defendant's criminal history, which included two prior felony convictions as well as other prior misdemeanor and petty offenses. Further, Sergeant O'Neill testified as to the circumstances giving rise to the defendant's prior felony convictions. Because this

information was presented to the court, we presume that the court considered it. See *Flores*, 404 Ill. App. 3d at 158. Moreover, the court expressly said that it considered the defendant's prior criminal activity in rendering his sentence. Although the defendant characterizes his criminal history as "largely nonviolent," we note that his prior felonies consisted of a violent offense and a firearms charge.

¶ 28 In support of his argument that the trial court failed to consider his rehabilitative potential, the defendant points to the court's statement his sentence was handed down "to ensure that you never walk amongst us again and you're never able to hurt another individual." However, in reviewing the court's sentencing decision, we do not focus on a few words or statements made by the court. *Newlin*, 2014 IL App (5th) 120518, ¶ 23. Instead, we determine whether the sentence was improper by considering the record as a whole. *Id*. Moreover, defendant's rehabilitative potential is only one of the factors that should be considered by the court in sentencing a defendant. *Flores*, 404 Ill. App. 3d at 159. The most important factor in sentencing, however, is the seriousness of the offense. *Id*. In rendering its sentence, the court is not required to explicitly outline its reasons for finding that defendant lacked rehabilitative potential. *Id*. "[T]he nature and circumstances of the offense and the history and character of the defendant will be the governing factors of rehabilitative potential." (Internal quotation marks omitted.) *Id*.

¶ 29 Upon reviewing the entire record of the defendant's sentencing hearing, it is clear the trial court weighed the appropriate aggravating and mitigating factors and decided an appropriate sentence in light of the seriousness of the offense. See *Abrams*, 2015 IL App (1st) 133746, ¶ 34 (the seriousness of the offense may outweigh the goal of rehabilitating

12

defendant). We find it important to highlight that the defendant was convicted of first degree murder, during which he shot the victim in the back from a close range of centimeters or less. The defendant's attempts to downplay the seriousness of his offense are not well taken. Additionally, the court is again presumed to have, and explicitly stated that it did, considered the PSI, which contained the information relating to the defendant's family, social support, education, and employment background, all of which the defendant relies on as evidence of his rehabilitative potential. As such, the defendant has failed to show that the court ignored these factors in determining the length of his sentence.

¶ 30    As for his remorse, the trial court heard the defendant express his remorse at sentencing and explicitly stated it considered the defendant's statement in rendering the sentence. Even though the court declared that it found no factors in mitigation and thus did not formally consider the defendant's remorse as a mitigating factor, we assume, absent some contrary indication, that the court properly considered it when fashioning the defendant's sentence. See *Flores*, 404 Ill. App. 3d at 158.

¶ 31    Because the defendant has failed to demonstrate that the trial court ignored his criminal history, rehabilitative potential, and remorse in fashioning the appropriate sentence, his contention that we should remand or reduce his sentence based on these factors is without merit. Therefore, we conclude that the court did not abuse its discretion in rendering the defendant's sentence.

¶ 32                                III. CONCLUSION

¶ 33    For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.

¶ 34   Affirmed.