NOTICE

Decision filed 06/08/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190526-U

NO. 5-19-0526

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 18-CF-8 |
| | ) | |
| ROLLIE ROZKIEWICZ, | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's sentence is affirmed where the trial court did not improperly consider a factor inherent in the offense or the defendant's lack of explanation or his conduct in aggravation, and where the court properly considered the evidence presented in mitigation.

¶ 2    This is a direct appeal from the circuit court of Marion County. The defendant, Rollie Rozkiewicz, pled guilty to aggravated discharge of a firearm. On April 16, 2019, he was sentenced to five years' imprisonment to be followed by two years of mandatory supervised release (MSR). The defendant raises two points on appeal: (1) the trial court violated the prohibition against double enhancements by considering the defendant's direction of fire, which was an inherent element of his offense, as a factor in aggravation; and (2) the court abused its discretion in rendering its

1

sentence where it relied on improper considerations and disregarded mitigating evidence. For the reasons that follow, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4      On January 8, 2018, the defendant was charged by information with home invasion (count I), aggravated discharge of a firearm (count II), and aggravated unlawful use of a weapon (count III). It was alleged that on January 6, 2018, the defendant unlawfully entered the dwelling of his estranged wife, Natasha Rozkiewicz, armed with a firearm, which he knowingly discharged "in the direction of other persons."

¶ 5      On February 5, 2019, the parties appeared for a guilty plea hearing. The State explained that the defendant would enter an open plea of guilty to count II, aggravated discharge of a firearm. In exchange for the defendant's guilty plea, the State agreed to dismiss counts I and III. There was no agreement as to the defendant's sentence. The State then presented the following factual basis that was stipulated to by the defendant. At approximately 6:20 a.m., on January 6, 2018, officers from the Salem Police Department were dispatched to the victim's residence. When they arrived, they spoke with the victim, who informed them that earlier that morning, the defendant came to her residence and "started beating on the doors and windows." She did not let him in "because she had a friend over" and did not want any "drama." The victim indicated that the defendant "may have been intoxicated," but she was not sure. After she did not open the doors or windows, the defendant "kicked the front door open" and entered the house "carrying a big black gun with a scope." The victim tried to push him back outside, but he pushed her down and fired a shot into the pantry, which she indicated barely missed her. The defendant then left her residence. Upon searching the victim's home, officers found "a shell casing as well as a bullet entry wound in the pantry area."

2

¶ 6　　The defendant was arrested in Alma shortly thereafter, and officers found a rifle in the bed of his truck that matched the one described by the victim.　Upon questioning, the defendant indicated that he had gone over to the victim's home that morning and, after seeing a vehicle in the driveway, he "essentially just kind of lost it.　He [did not] remember what happened after that." After finding there was a factual basis for the plea, and that it was knowingly and voluntarily made, the trial court accepted the defendant's guilty plea.

¶ 7　　On April 16, 2019, the trial court held a sentencing hearing.　As evidence in mitigation and aggravation, the parties generally relied on the following information contained in the presentence investigation report (PSI).　The defendant was born to unmarried parents in 1989 and had three older half-siblings.　He did not have much of a relationship with his father growing up, and his father passed away in 2010 when the defendant was 21 years old.　His mother "could not keep a clean house," and "the living conditions were so bad he had to go stay with his grandparents often." The defendant also mentioned involvement by the Illinois Department of Children and Family Services during his childhood.　The defendant had a great relationship with his grandparents and felt they "raised him more than his own mother did."　He dropped out of high school in eleventh grade but obtained his GED in 2017.

¶ 8　　The defendant maintained employment throughout most of his adult life.　After a stretch of unemployment lasting just over a year, the defendant began working full-time at North American Lighting (NAL) in Salem in October 2017.　After posting bail for the present offense, he worked elsewhere for several months, before returning to NAL in October 2018, which was where he was employed at the time of sentencing.

¶ 9　　The defendant had never used illegal drugs, and he had no documented history of violence or other felony convictions.　Other than a 2017 misdemeanor driving under the influence (DUI)

3

charge, for which he received two years of court supervision, he had no prior criminal history. His probation officer stated that, while on supervision, the defendant never missed an appointment, never failed a drug test, and was overall compliant with the terms and conditions of his supervision.

¶ 10    In 2017, the defendant completed a DUI class and received a certificate of completion. Upon his admission to the class, he was diagnosed with "moderate substance use disorder" for his alcohol use, which placed him in a significant risk classification. During the PSI interview, the defendant described himself as a "weekend drinker," drinking "between six and eight beers for the whole weekend." However, he also indicated that he had not drank alcohol for approximately two years, and his fiancée confirmed that he did not consume drugs or alcohol.

¶ 11    At the time the PSI was prepared, the defendant and the victim were still married but separated. They got along for the most part but had no immediate plans to reunite. They had a daughter together, who was six years old in 2019 and primarily lived with the victim. Following their separation, the defendant began a "serious relationship" with Samantha Mickens, eventually proposing and moving in with her and her children in a two-bedroom trailer in Alma. Mickens described the defendant as "a kind person" who helped "take care of their family." She said he "really [helped] her out a lot," including by caring for her three kids, the youngest of whom was autistic, while she worked. Mickens also said he was a "good father figure to her children," and, if he were sent to prison, they would be "devastated." The PSI indicated that Mickens was pregnant with the defendant's child; by the end of the year, she had given birth to a son.

¶ 12    Although the defendant said he got along with most people and had a "few close associates at work," he did not have any close friends. He enjoyed outdoor activities with his family, such as fishing and working on cars in his garage. He liked his neighborhood in Alma because it was "safe" and "quiet."

4

¶ 13    When asked about the current charges in the PSI interview, the defendant admitted going to the victim's house that morning; he grabbed his gun after he saw an unknown car in the driveway. He knocked on the front door, but when there was no answer, he knocked on the window, which was something he had done in the past. However, he told the interviewer that he did not recall much of what happened after that "due to things happening so quickly." The PSI also indicated that the defendant took responsibility for his crime and was "regretful about what he did"; in particular, he "felt bad for making his wife be fearful for her life." The defendant did not know "why he did what he did," he was "disturbed" by his conduct, and he did not "take any pride in the offense that he committed."

¶ 14    The defendant's desired outcome for this case was for him to be placed on probation because he had "his life together" and was "working full-time to support his family." He added that since he was employed, he would be able to pay any fines and fees, and he would be able to make all required treatment and office appointments without any transportation issues. The defendant was ultimately assessed "at a low risk level" under the Illinois Adult Risk Assessment due to the absence of "criminal history, neighborhood problems, substance use, and criminal attitudes and behavioral patterns," though the PSI did note his lack of "prosocial activities and family support."

¶ 15    Attached to the PSI were two reports from deputies with the Marion County Sheriff's Office, which contained additional details about apprehending the defendant and his arrest. Deputies were dispatched to assist the Salem Police Department with a "possible home invasion involving shots being fired inside the residence." They were informed that a male suspect had "just fired a long rifle with a scope in a residence" before leaving in a black Chevrolet pickup truck. At approximately 6:30 a.m., one of the deputies spotted the truck in Alma and identified

the defendant as the driver. He activated his emergency lights and siren, but the truck did not stop immediately; instead, it "sped up, *** blew the four-way stop sign," and continued for another block before coming to a stop.

¶ 16    The deputy then described what happened next:

> "[The defendant] immediately got out of the truck and started walking back to me. *** I then ordered [the defendant] by gun point to get on the ground. [The defendant] stated 'f*** you! Shoot me, shoot me, shoot me.' I again multiple times ordered [the defendant] on the ground and again [the defendant] stated 'shoot me.' "

The deputy continued to order the defendant to the ground, but he still did not comply and repeatedly told the officer to shoot him. Eventually, the deputy switched to his taser and deployed it, hitting the defendant in the left leg, who "immediately went to the ground." As the deputy was attempting to handcuff him, the defendant did not immediately obey his orders to put his arms behind his back, so the officer "drive tased" him on the right leg, at which point the defendant apologized and became compliant.

¶ 17    The defendant was handcuffed and searched. In his pockets, officers found "a live .22-250 REM round," along with his house keys and a pocketknife. A long, black rifle with a scope was located in the back bed of the truck and its case was found in the cab. The rifle, a Savage Axis .22-250, had one spent round in the chamber and one live round in the magazine.

¶ 18    As additional evidence in aggravation, the State tendered the victim's written impact statement. In relevant part, the statement provided that she and the defendant had been married since 2007 but separated in 2017. During their 10-year marriage, the couple had been through some "rocky times," and by the end, the marriage had become "unfixable." The victim blamed their marital problems in part on the defendant's drinking. However, she said it was "an amicable breakup," and after he moved out of their home in November 2017, their relationship improved somewhat as they were able "to speak without arguing constantly."

6

¶ 19   They were able to coparent their six-year-old daughter without issues, even working out an agreement for shared custody without a court order. Their daughter spent every other weekend with the defendant. The victim said the defendant tried to see his daughter "every day" and took her out to eat on Wednesdays. The victim was not upset by the defendant's new relationship; she and the defendant did not argue about it.

¶ 20   On the night of Friday, January 5, 2018, the victim decided to go out with friends to celebrate her birthday, which was earlier that week. Their daughter was with the defendant for the weekend, so she called his cell phone that evening to wish her a good night "as [she] always did." Afterwards, the defendant texted her "several times throughout the night," asking where she was, who she was with, and if she was with any men. She responded by telling him where she was and who she was with; their conversation ended around 1:30 a.m. The victim said she did not hear anything more from him, until "about 5 hours later," when he "kicked the door to the house in, came in with a gun, told me he was going to kill me and fired the gun in the house." The victim also stated, "To this day, I still believe that when he fired the gun, he was trying to shoot me, but missed." She never would have predicted that the defendant would act in such a manner, which made "it very difficult for [her] to feel safe" that such an intrusion would not happen again. She had lived in fear since the incident and felt that she could not trust anyone.

¶ 21   The only other evidence offered in mitigation was the defendant's statement of allocution, during which he said:

> "Your Honor, I want to apologize to the Court and to Natasha Rozkiewicz for what I did. If I could take it back I sure would. I don't know what come [*sic*] over me. I'm very sorry. Like I said, if there was something to do to change it, I would. I know she's afraid. I don't want anybody to be afraid. And—I'm just very sorry.
> Like I said, I wouldn't want to see anybody go through that. If I knew what came over me—I would—I could tell you, but I don't remember nothing. So—that's about all I've got to say."

7

¶ 22    The parties stipulated that aggravated discharge of a firearm was a probationable offense, and the defendant was eligible for probation.  Defense counsel requested that the defendant be sentenced to four years' probation with random drug and alcohol testing, a mental health evaluation, a no-contact order with the victim or her residence, and compliance with any other treatment or conditions as needed.  The State, on the other hand, requested 10 years' imprisonment, asserting that, given the "nature of this offense" and "the consequences that are often caused," a sentence of imprisonment was "necessary for the protection of the public, particularly the victim."

¶ 23    During argument, the parties did not cite any specific statutory factors in aggravation or mitigation.  The State acknowledged this was "a difficult case," saying that "every predictive factor" typically used in sentencing was "basically in this defendant's favor."  Nevertheless, the State argued that the defendant committed "an extremely serious crime," which was something the trial court should consider when determining whether probation was appropriate.  Among other things, the State argued that the defendant posed a threat to the victim, and "the complete randomness" of what happened meant there was no guarantee that it would not "just as randomly reoccur."  Calling the defendant's explanation that he "just blacked out" disingenuous, the State argued, "The reality is why this defendant did that is known only to him.  He's clearly not sharing with the rest of us."

¶ 24    In its response, defense counsel acknowledged this was "truly a horrific offense" and "something that [the victim] shouldn't have ever had to go through."  Counsel nevertheless asserted that it was an "aberration" for the defendant, rather than something in line with his character.  He described the defendant as someone "who has led a peaceful life" and "has worked hard to obtain things in his life despite obstacles he's had to overcome."  He also noted his steady employment history, saying he "has shown us he has the ability to work a job and provide for those

8

who require his support," as well as his relationship with his current girlfriend, in which the defendant had become "a father figure to children, not his own, including one that is special needs."

¶ 25 Defense counsel also pointed out that, "While a serious offense, it is one the legislature *** has chosen to make eligible for probation," and argued there was nothing in the facts of this case to overcome the presumption in favor of probation. If anything, counsel asserted, the defendant's character and conduct suggested he would be able to comply with probation and would be unlikely to reoffend. He asserted that the defendant had done everything he could "to address the issues that he's facing to insure [*sic*] that this will never happen again." As for whether probation would deprecate the seriousness of the offense, counsel questioned, "what is there to argue other than the offense itself, which the legislature has made probationable." Defense counsel concluded by requesting that the trial court "follow the law" and sentence the defendant to probation.

¶ 26 In rendering its sentence, the trial court stated that it had reviewed the PSI, the victim impact statement, the defendant's statement in allocution, and the court file. The court acknowledged that, "in all aspects," the defendant "placed himself in a very good position regarding his sentence." It nonetheless found that he had not been "open and honest as to what really occurred that night." Referring to the portion of the PSI where the defendant discussed the offense, the court said, "I do find that explanation disingenuous. It probably carried more weight if he had just said I saw red and got mad and went in there, because I thought she was with someone else. That explanation would be simple enough, but he didn't say that."

¶ 27 The trial court acknowledged the impact the defendant's conduct had on the victim. The court noted that while probation was the "preferred sentence," there were "exceptions to that rule," including "when probation would deprecate the seriousness of the offense." It described the

9

offense, noting that the victim "thought she was being shot at and that the shot came close to her." It also stated that while it could not recall where the bullet was found, "The point is, it wasn't the ceiling." Considering the relevant factors, including the defendant's age, educational background, and rehabilitation potential, as well as the need to protect the public, deterrence, and punishment, the court found the key factor to be the seriousness of the offense. The court then stated:

> "Because of the lack of explanation, because of the seriousness of the offense, I'm not going to place him on probation. I'm going to sentence him to five years in the Department of Corrections to be followed by a two-year period of mandatory supervised release.
>
> * * *
>
> Sir, this has been a difficult decision for the Court. You've made substantial strides. You were on the right course. But, on the other hand, the act is just so serious and so dangerous that I cannot ignore it. That I cannot diminish it in any way. So that's why I'm sentencing you to the Department of Corrections."

¶ 28 Following the announcement of the trial court's judgment, the defendant made an oral motion for an approved furlough. The defendant requested "a week or so" so that he could "get his affairs in order" by giving his employer proper notice and remain eligible for rehire upon release. The State objected to the motion. The court denied the motion, finding that it could not be certain that the defendant would not be violent again.

¶ 29 On April 25, 2019, the defendant filed a motion to reconsider sentence followed by an amended motion to reconsider. The defendant asserted that the trial court did not consider all the statutory factors in mitigation and that it improperly considered "the fact that the gun was fired in the direction of the victim and not into a ceiling (in the court's hypothetical)" as a "double enhancement." In response, the State contended that the sentence was proper, and the court did not make its sentencing determination because the defendant "shot in the direction of somebody."

¶ 30 The trial court stated that it considered whether it "placed undue weight on the fact that [the defendant] shot downrange and not elsewhere in the house." It acknowledged that it

10

considered various elements of the offense with respect to the seriousness of the offense. Although the court noted and inquired as to "where the shot ended up," it did not give it undue weight. The court also noted that the sentence imposed was within the statutory range established by the legislature. The court denied the motion to reconsider.

¶ 31    The defendant filed his notice of appeal on December 13, 2019.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, the defendant makes two contentions. First, he argues that the trial court violated the prohibition against double enhancements by considering the direction of fire, which was an inherent element of his offense, as a factor in aggravation. Second, he maintains that the court abused its discretion in rendering his sentence where it relied on improper considerations and disregarded mitigating evidence.

¶ 34    The defendant was convicted of aggravated discharge of a firearm with a sentencing range of 4 to 15 years' imprisonment or up to 4 years' probation. See 720 ILCS 5/24-1.2(a)(2) (West 2018); 730 ILCS 5/5-4.5-30 (West 2018). He was sentenced to five years' imprisonment followed by two years of MSR, which was within the sentencing range.

¶ 35    It is well settled that a trial court is given broad discretion in fashioning a sentence. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). When a sentence falls within the statutory sentencing range for an offense, it may not be disturbed absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable to the extent that no reasonable person would agree with it. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32. The court is given such deference because it is in a better position to consider, among other things, defendant's credibility, mentality, demeanor, general moral character, age, habits, and social environment. *Id*. A proper sentence balances the seriousness of

11

the offense with the objective of restoring a defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11.

¶ 36    The Unified Code of Corrections permits the trial court to consider certain statutory factors in aggravation and mitigation when imposing a sentence of imprisonment. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2018). In fashioning the appropriate sentence, the court must carefully weigh all of the factors in mitigation and aggravation, which include defendant's age, demeanor, habits, credibility, criminal history, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). When such factors have been presented for the court's consideration, it is presumed, absent some contrary indication, that the factors have been considered. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). A court has considerable latitude in sentencing a defendant, as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *Id.* at 157. When reviewing a court's sentencing decision, the reviewing court should not focus on a few words or statements made by the court. *People v. Ward*, 113 Ill. 2d 516, 526 (1986). Instead, the determination of whether the sentence was improper must be made by considering the record as a whole. *Id.* at 526-27. The decision of whether the court relied on an improper factor in sentencing a defendant ultimately presents a question of law we review *de novo*. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 37    The defendant's first claim of error with respect to his sentence is that the trial court improperly considered an element that is inherent in the offense itself. Although the court exercises broad discretion in imposing a sentence, it is not allowed to consider a factor implicit in the offense as a factor in aggravation. *Id.* ¶ 9. "[A] single factor cannot be used both as an element of an offense and as a basis for imposing a 'harsher sentence than might otherwise have been

12

imposed.' " *Id.* (quoting *People v. Gonzalez*, 151 Ill. 2d 79, 83-84 (1992)).  However, this rule is not to be strictly applied, as public policy requires that a sentence shall be determined in accordance with the circumstances of the particular offense.  *People v. Thomas*, 171 Ill. 2d 207, 226-27 (1996); *People v. Cain*, 221 Ill. App. 3d 574, 575 (1991).  A defendant bears the burden of proving the court relied on an improper factor in imposing his sentence.  *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 9.

¶ 38     In this case, the defendant maintains the trial court erred in considering a factor inherent in the offense of aggravated discharge of a firearm—his direction of fire.  However, we find it is clear from the court's statements, when read in context of the record as a whole, that the court was not considering the defendant's direction of fire as a single factor in aggravation.  Instead, the court was considering it as indicative of the seriousness of the offense, which it repeatedly found was the "key factor" in its sentencing decision.  The court's statements were consistent with the State's argument that, although many of the sentencing factors weighed in the defendant's favor, he committed "an extremely serious crime" and posed a threat to the victim, which was relevant to whether probation was appropriate.  Furthermore, the court's remarks during the reconsideration hearing—that it considered various elements of the offense with respect to the seriousness of the offense—confirm that the court was not relying on the elements of the offense as aggravating factors in deciding his sentence.

¶ 39     As recently explained by the First District:

> "A trial court is not required to refrain from any mention of sentencing factors that constitute elements of the offense. [Citation.]  Sentencing hearings do not occur in a vacuum, and the duty to impose a fair sentence entails an explanation of the court's reasoning in the context of the offenses of which a defendant has been convicted.  A fair sentence is not just the product of mechanically tallying factors in aggravation and mitigation and calculating the result.  Indeed, a sentencing hearing is likely the only opportunity a court has to communicate its views regarding the defendant's conduct, and thus we do not agree that a trial judge's commentary on the nature and circumstances of a

13

defendant's crimes necessarily results in improperly using elements of the offense as factors in aggravation." *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 15.

We agree with the foregoing reasoning, and thus, we find the defendant has failed to satisfy his burden of proving the court improperly relied on a factor inherent in the offense of aggravated discharge of a firearm in rendering his sentence.

¶ 40 The defendant also asserts the trial court improperly considered his "lack of explanation" in aggravation. He contends this was "tantamount to punishing [him] for failing to admit his guilt," and it was not relevant to his rehabilitative potential. For the following reasons, we disagree.

¶ 41 "A trial court should not automatically and arbitrarily consider a defendant's insistence on his or her innocence as an aggravating factor when sentencing him." *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011). However, under certain circumstances, a defendant's continued protestation of innocence and a lack of remorse may convey a strong message to the sentencing court that defendant is an unmitigated liar who is at continued war with society. *Ward*, 113 Ill. 2d at 528. Thus, a defendant's failure to show remorse or a penitent spirit may be properly considered in determining his sentence, but these factors must be evaluated in light of all other relevant factors. *People v. Thompson*, 234 Ill. App. 3d 770, 779 (1991). A trial court is at liberty to express its belief of defendant's guilt; it is also free to consider defendant's protestations of innocence, lack of remorse, and veracity as demonstrative of his character and prospects for rehabilitation. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 29; *People v. Speed*, 129 Ill. App. 3d 348, 349 (1984).

¶ 42 In determining whether a sentence was improperly influenced by defendant's failure to admit guilt, reviewing courts focus on whether the trial court indicated, either expressly or implicitly, that there would be better treatment during sentencing if defendant abandoned his claim of innocence. *People v. Byrd*, 139 Ill. App. 3d 859, 866 (1986); *Speed*, 129 Ill. App. 3d at 350. If the court indicated that a failure to admit guilt justified a lengthier sentence, then the sentence

14

likely was improperly influenced by defendant's persistence in claiming his innocence. *Speed*, 129 Ill. App. 3d at 350. However, if the record shows that the court only referenced the factor of remorsefulness as bearing upon defendant's rehabilitative potential, then its reference thereto is not reversible error. *Id*.; see also *People v. Coleman*, 135 Ill. App. 3d 186, 188 (1985).

¶ 43    In *Ward*, defendant expressed his innocence in his statement of allocution, and the sentencing court responded that defendant's statement almost made the court want to sentence him to what the State was asking for because he showed no repentance when he addressed the court. *Ward*, 113 Ill. 2d at 524. Then, when imposing the sentence, the court indicated that it was rejecting the minimum sentence because defendant showed " 'no contrition. ' " *Id*. at 525. On appeal, our supreme court rejected defendant's claim that the trial court improperly used his claim of innocence as an aggravating factor. *Id*. at 530-33. In making this decision, the supreme court indicated that it did not know what other factors, not revealed by a cold record, such as tone of voice, facial expressions, and general demeanor, led to the sentencing court's conclusion that defendant showed a lack of contrition. *Id*. at 530. The court concluded that the trial judge was in a superior position to evaluate those factors, and the judge had the right to consider defendant's lack of contrition and protestation of innocence in light of the other relevant facts in the case. *Id*. at 530-31. Defendant's protestations of innocence and lack of remorse shall be evaluated in light of the other information that the court has about defendant and all the other facts of the case in determining what relevant meaning defendant's attitude displays with respect to his potential for rehabilitation and restoration to a useful place in society. *Id*. at 529. Because the court found no abuse of discretion in the trial court's consideration of defendant's protestation of innocence, it affirmed defendant's sentence. *Id*. at 531.

15

¶ 44    In contrast, in *Speed*, which was decided before *Ward*, the Second District determined that the record revealed a clear indication that the sentencing court improperly increased defendant's term of imprisonment from 10 years to 11 years solely because defendant continued to protest his innocence. *Speed*, 129 Ill. App. 3d at 351.  At sentencing, the court indicated that it was considering a 10-year sentence, but the fact that defendant expressed his innocence of the convicted crime " 'tilted the scale the other way, ' " and the court sentenced him to 11 years' imprisonment. *Id.* The appellate court found that defendant's sentence was improperly influenced by his persistent denial of his guilt, as the sentencing court did not merely address the factors of remorsefulness or veracity as they bore on defendant's rehabilitative potential. *Id.*

¶ 45    Here, unlike *Speed*, there is nothing in the record to indicate that the trial court explicitly or implicitly imposed a more severe sentence solely due to any alleged protestations of innocence by the defendant.  Instead, the record, when read as a whole, merely shows that the court considered the defendant's "lack of explanation" to be demonstrative of his lack of remorse and veracity as those factors relate to his rehabilitative potential.  As we previously noted, a defendant's failure to show remorse or a penitent spirit may be considered in determining the sentence; a trial court is not prohibited from considering a defendant's lack of remorse as a factor in aggravation as long as its decision is not automatic or arbitrary.

¶ 46    The defendant argues, however, that the trial court erroneously viewed his lack of explanation for his conduct as a lack of remorse.  He contends that the record indicates he expressed remorse in that, although he said he did not know "why he did what he did," he also apologized to the victim and the court "for what [he] did."  After carefully considering the record as a whole, we disagree with the defendant's assessment of the court's statements.  Although the court referenced the fact that the defendant had not been "open and honest as to what really

16

occurred that night" and that his explanation was "disingenuous," we do not find it erroneous for the court to infer, in light of the evidence presented, that the defendant's inability to explain his conduct against the victim demonstrated a lack of remorse and veracity as relevant to his rehabilitative potential. The defendant's lack of explanation was also relevant to whether he posed a continued threat to the victim because there was no way to determine why he attacked her or if he would do it again. "The trial court here was not bound to adopt a particular interpretation of defendant's statement in allocution but was rather free to determine the message it conveyed." *Charleston*, 2018 IL App (1st) 161323, ¶ 30. The trial court is in the best position to evaluate the sincerity of the defendant's remarks. *Thompson*, 234 Ill. App. 3d at 779. As in *Ward*, we do not know what other factors, which are not revealed by the cold record, such as tone of voice, facial expressions, and general demeanor, led to the court's conclusion that the defendant showed a lack of remorse.

¶ 47    Further, we find that the trial court's statements cannot be interpreted to mean that the defendant would have received a lighter sentence had he admitted his guilt or provided an explanation for his conduct. In fashioning the defendant's sentence, the court noted that it considered the PSI; the victim impact statement; the court file; the defendant's statement in allocution; and the relevant factors including his age, his educational background, his rehabilitative potential, the need to protect the public, deterrence, punishment, and the seriousness of the offense. The record reveals that the sentence imposed was heavily influenced by the seriousness of the offense and the impact of the defendant's conduct on the victim. Thus, because the court's reference to the defendant's "lack of explanation" for his conduct did no more than address his remorsefulness and veracity as they related to his rehabilitative potential, the court did not err in considering it.

17

¶ 48    Finally, the defendant asserts that the trial court failed to consider mitigating evidence weighing in favor of probation. We disagree. The offense of aggravated discharge of a firearm is a Class 1 felony punishable by a sentence of between 4 and 15 years' imprisonment (720 ILCS 5/24-1.2(a)(2), (b) (West 2018); 730 ILCS 5/5-4.5-30(a) (West 2018)). However, it is a probationable offense. See 730 ILCS 5/5-4.5-30(d), 5-6-1(a) (West 2018). Generally, the Unified Code of Corrections (Code) creates a presumption in favor of probation. *People v. Daly*, 2014 IL App (4th) 140624, ¶ 28. Section 5-6-1(a) of the Code requires a sentence of probation unless the court finds a prison sentence is necessary for the protection of the public or if probation would deprecate the seriousness of the offender's conduct. 730 ILCS 5/5-6-1(a) (West 2018). When making this determination, the court must consider the nature and circumstance of the offense and the history, character, and condition of the offender. *Id.*

¶ 49    Because the defendant's five-year sentence was within the applicable sentencing range, it is presumptively valid. See *Sauseda*, 2016 IL App (1st) 140134, ¶ 12 (similarly finding). We also presume that the trial court considered the mitigating evidence presented to it, absent evidence to the contrary. *Flores*, 404 Ill. App. 3d at 158. "The existence of mitigating factors does not mandate imposition of the minimum sentence [citation] or preclude imposition of the maximum sentence [citation]." *Id*. Further, we may not reweigh the aggravating and mitigating factors considered by the sentencing court. *Id*.

¶ 50    Upon reviewing the entire record of the defendant's sentencing hearing, it is clear the trial court weighed the appropriate aggravating and mitigating factors and decided an appropriate sentence given the seriousness of the offense. See *Abrams*, 2015 IL App (1st) 133746, ¶ 34 (the seriousness of the offense may outweigh the goal of rehabilitation). Nevertheless, the defendant contends that the trial court failed to issue "any findings regarding [his] rehabilitative potential,

the likelihood of his success on probation, or the excessive hardship to his dependents." However, as previously discussed, the trial court considered the defendant's rehabilitative potential *vis-à-vis* the lack of explanation for his conduct, his veracity, and lack of remorse. We also note that in rendering its sentence, the court is not required to explicitly outline its reasons for finding that defendant lacked rehabilitative potential, and a defendant's rehabilitative potential is only one of the factors to be considered by the court in sentencing a defendant. *Flores*, 404 Ill. App. 3d at 159.

¶ 51    Further, the defendant's compliance with the terms of his pretrial release and likelihood of success on probation were discussed in the PSI and during sentencing. Similarly, evidence was presented to the trial court that the defendant had two children, including an infant, and that he was a father figure to Mickens's children. Counsel also addressed these factors during arguments. Therefore, there is no evidence in the record to rebut the presumption that the court considered these factors. See *Sauseda*, 2016 IL App (1st) 140134, ¶ 20 (similarly finding). As such, we presume the court considered them in fashioning the appropriate sentence for the defendant. See *id.*; see also *Flores*, 404 Ill. App. 3d at 158.

¶ 52    In sum, we find that the record is clear that the trial court considered the nature and circumstances of the defendant's offense as well as his history, character, and condition in determining whether probation was proper in this instance. The court nevertheless found that probation would deprecate the seriousness of the defendant's conduct, which the court considered the "key" factor in its sentencing decision. See *Flores*, 404 Ill. App. 3d. at 159 (the most important factor in sentencing is the seriousness of the offense). The court's statements indicate that it found a prison sentence was necessary to protect the public and the victim. In light of the foregoing, the court did not err in finding that the presumption in favor of probation was rebutted under the circumstances of this case.

¶ 53                           III. CONCLUSION

¶ 54    For the foregoing reasons, the judgment of the circuit court of Marion County is hereby affirmed.


¶ 55    Affirmed.